206 F.3d 857 (9th Cir. 2000)
 DEAN DEBOER; LUANNE DEBOER, Plaintiffs-counter-defendants-Appellants,
v.
CORRINE PENNINGTON; CAROL BROWDER; JANE DOE DOUGLAS; TIMOTHY CARPENTER; JANE DOE DISEND; JANE DOE LITTLE; JANE DOE AYERS; JOHN DOE BJORNSON; JANE DOE HANNA; JANE DOE GISCHER; JANE DOE KNUTSON; JANE DOE HALL; JOHN DOE PENNINGTON; JOHN DOE BROWDER; JANE;DOE ROWE, OPINION Defendants-Appellees,
And
CITY OF BELLINGHAM; TIM DOUGLAS; LYNN CARPENTER; BRUCE DISEND; RICHARD LITTLE; BRUCE AYERS; LOUISE BJORNSON; ARNE HANNA; PAT ROWE; DON GISCHER; GENE KNUTSON; BOB HALL, Defendants-counter-claimants-Appellees.
 No. 97-35363
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted July 8, 1998
Filed March 17, 2000
 
 1
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 
 
 2
 COUNSEL: Kurt Denke, Seattle, Washington, for the plaintiffs-appellants.
 
 
 3
 Peter Berney, Assistant Attorney General, Olympia, Washington, for defendants-appellees Carol Browder and Corine Pennington.
 
 
 4
 Robert L. Christie, Johnson & Martens, Seattle, Washington, for the defendants-appellees.
 
 
 5
 Appeal from the United States District Court for the Western District of Washington; William L. Dwyer, District Judge, Presiding. D.C. No. CV-95-01402-WLD
 
 
 6
 Before: William C. Canby, Jr. and A. Wallace Tashima, Circuit Judges, and Robert M. Takasugi,* Senior District Judge.
 
 Opinion by Judge Takasugi
 TAKASUGI, Senior District Judge:
 
 7
 In this appeal, we consider whether city and state officials are entitled to qualified immunity for entering city-owned premises and seizing the business and personal records and the personal property of an individual where the city and the individual had agreed that "[f]inancial records for audit purposes shall be made available to the [c]ity and any other governmental agency with jurisdiction," and whether the agreement between the city and the individual created a constitutionally protected property interest.
 
 I.
 
 8
 In November 1993, the City of Bellingham, Washington (the "City") entered into a written agreement (the "Agreement") with D & M Operating Company ("D & M"), to manage the City-owned Bayview Cemetery ("Bayview"), from January 1, 1994, to December 31, 1998. The Agreement was signed on behalf of the City by the mayor, Tim Douglas ("Douglas"), and on behalf of D & M by Dean DeBoer ("DeBoer"). Under the Agreement's terms, D & M would sell graves and merchandise, maintain records, schedule funerals and to some extent, maintain Bayview's grounds. In return, the City would pay D & M a monthly fee and a portion of the proceeds of Bayview's monuments and memorials sales.
 
 
 9
 Article X of the Agreement provides that the Agreement could be terminated for cause or convenience,[1] and Article V of the Agreement sets forth D & M's obligation to maintain Bayview's financial records.[2]
 
 
 10
 In addition to his involvement with D & M, DeBoer operated another business, Cascade Memorials, which sold grave markers to the City.
 
 
 11
 Beginning in January 1994, DeBoer maintained an office at Bayview and managed Bayview pursuant to the Agreement's terms. In the fall of 1994, the City commissioned an independent certified public accountant to audit Bayview's financial records for time periods both prior to Bayview's association with D & M and after the Agreement was in effect. The accountant examined the financial records of Bayview from January 1, 1989 through June 30, 1994, and discovered that D & M had overand under-billed the City on a number of contracts which resulted in the City's overpayment, in an amount totaling $21,151.00. Shortly thereafter, the City conducted an audit of the City's purchases from Cascade Memorials and discovered that the City had also overpaid Cascade Memorials, in the amount of $2,906.00. DeBoer, claiming that the billing errors were unintentional, returned the City's overpayments.
 
 
 12
 In a letter dated December 13, 1994, the City notified DeBoer of its intent to terminate the Agreement for convenience pursuant to Article X, Section B. The City further advised DeBoer that it was also exercising its right to terminate the Agreement for cause pursuant to Article X, Section A, and listed the reasons for termination. DeBoer's attorney notified the City in a letter dated December 28, 1994 that DeBoer intended to take the full sixty days provided in Article X, Section B of the Agreement to decide whether to terminate the Agreement for convenience. The letter also informed the City that, in accordance with Article X, Section A, DeBoer had eliminated or rectified each of his alleged violations of the Agreement charged within fifteen days of the City's notice.
 
 
 13
 Thereafter, on January 23, 1995, the City Council decided that it would send another letter terminating the Agreement and that Bayview's records should be secured in order to preserve the possibility of further audits. On January 27, 1995, the City's finance director, Lynn Carpenter ("Carpenter") met with Corinne Pennington and Carol Browder (collectively the "State Defendants") of the Washington State Auditor's Office, and requested that the State Defendants perform an audit of Bayview's financial records. The State Defendants refused to subpoena and audit Bayview's records, but indicated to Carpenter that they may be able to "rehabilitate" Bayview's records once the Agreement was terminated.
 
 
 14
 On January 30, 1995, City Councilman Bruce Ayers ("Ayers"), Assistant City Attorney Dick Little ("Little") and Carpenter met with officers of the City's Police Department and expressed a desire for a criminal investigation into DeBoer's accounting for possible fraud. They also requested the police obtain a search warrant because the City planned to terminate the Agreement with D & M the following day and feared that records proving the alleged over-billings were intentional might be destroyed. Ayers informed the police that some of the information was contained on computers. He also informed the police that at least one computer belonged to DeBoer and was not the property of the City. The attempt to obtain a search warrant was unsuccessful.
 
 
 15
 On January 31, 1995, the City Council directed the City Attorney Bruce Disend ("Disend") and Little to prepare a termination letter addressed to DeBoer. The letter was drafted, and it stated that the City's position was that the Agreement was terminated for cause effective in fifteen days, on February 15, 1995, pursuant to Article X(A)(2) of the Agreement. The letter also stated that DeBoer was to leave Bayview immediately and to leave behind "all records and property of whatever nature pertaining to Cascade Memorials and D & M Operating Company." Several City employees accompanied by police officers delivered the termination letter to DeBoer at Bayview, forced DeBoer to leave the premises under threat of arrest and sealed the grounds. DeBoer removed blank checks from the Bayview office, but the business records of D & M and Cascade Memorials and DeBoer's personal records, and equipment including, a truck, tractor, backhoe, photocopy machine and other memorial manufacturing equipment were sealed on Bayview grounds. The State Defendants advised the City employees on-site of the records, including computer files and cabinets, necessary to conduct an audit. The following day, the records were removed from the premises for an audit by the State Defendants.
 
 
 16
 In late February, DeBoer was allowed to return to reclaim his equipment. His records were returned by the State Defendants some months thereafter.
 
 
 17
 DeBoer and his spouse, Luanne DeBoer, (collectively the "DeBoers") filed suit against the City, seven City Council members,[3] Douglas, Disend, Little, Carpenter, the State Defendants and the spouses of these individual defendants, for violation of the DeBoers' due process and Fourth Amendment[4] rights under 42 U.S.C.S 1983 and against the City for breach of contract.
 
 
 18
 The DeBoers moved for partial summary judgment on their claims asserting deprivation of rights guaranteed by the Fourth Amendment. City employees Carpenter, Disend, Douglas, Little and the City Council members (collectively the "Bellingham Defendants") and the City filed a crossmotion for partial summary judgment as to the same claim. State Defendants moved for partial summary judgment as to the DeBoers' civil rights claims. The district court ruled that the State Defendants could not be held liable for the termination of the Agreement as no issue for trial existed as to their involvement in the termination, thereby granting partial summary judgment in favor of State Defendants on the DeBoers' due process claim. The district court, however, denied the cross-motions with respect to the DeBoers' Fourth Amendment claim.
 
 
 19
 The Bellingham Defendants and the City then moved for partial summary judgment as to the DeBoers' S 1983 claim for violation of their due process rights and claim for breach of contract. The district court concluded that the Agreement did not afford a property right subject to due process protection, granted partial summary judgment on the DeBoers' due process claim, and denied the City's motion on the breach of contract claim.
 
 
 20
 Thereafter, the Bellingham Defendants moved for partial summary judgment on the DeBoers' S 1983 claim for violation of their Fourth Amendment rights asserting qualified immunity. The DeBoers brought a cross-motion. The district court granted summary judgment in favor of the Bellingham Defendants and denied the DeBoers' motion, ruling that the Bellingham Defendants were entitled to qualified immunity because reasonable officials could have believed that their actions were lawful. Becauseof this ruling, the DeBoers stipulated to, and the district court ordered, the dismissal of the DeBoers' Fourth Amendment claim against the State Defendants because the DeBoers conceded that the State Defendants would also be entitled to qualified immunity pursuant to the court's reasoning. The parties subsequently stipulated to granting final judgment in favor of all individual defendants. The district court found no just reason for delay and entered final judgment in favor of all individual defendants pursuant to Federal Rule of Civil Procedure 54(b). Thereafter, the DeBoers filed this appeal contending that the district court erred in its grant of summary judgment in favor of the Bellingham Defendants, dismissal of the State Defendants, and denial of the DeBoers' cross-motion for summary judgment on the issue of qualified immunity concerning the Bellingham Defendants. They assert that the Bellingham Defendants and the State Defendants are not entitled to qualified immunity, and the Agreement with the City created a constitutionally protected property interest subject to procedural due process. We reverse and remand.
 
 II.
 
 21
 We have jurisdiction under 28 U.S.C. S 1291 to review the district court's grant of summary judgment in favor of the individual defendants, and the district court's denial of the DeBoers' cross-motion for summary judgment against the Bellingham Defendants on the issue of qualified immunity. See McGregor v. Nat'l R.R. Passenger Corp., 187 F.3d 1113, 1114 (9th Cir. 1999). We review a trial court's grant or denial of summary judgment de novo, see PCCE, Inc. v. United States, 159 F.3d 425, 427 (9th Cir. 1998), using the same standard set forth in Federal Rule of Civil Procedure 56(c). See Ghotra v. Bandila Shipping, Inc., 113 F.3d 1050, 1054 (9th Cir. 1997), cert. denied, 522 U.S. 1107 (1998). We view the evidence in the light most favorable to the nonmoving party to determine whether genuine issues of material fact exist and whether the trial court correctly applied the relevant substantive law. See Warren v. City of Carlsbad , 58 F.3d 439, 441 (9th Cir. 1995)
 
 A. Qualified Immunity
 
 22
 The DeBoers contend that the seizure of their equipment and business records was not founded upon any objectively reasonable view of the law and, therefore, the Bellingham Defendants and the State Defendants are not entitled to qualified immunity.
 
 
 23
 The Bellingham Defendants maintain that they enjoy qualified immunity because the Fourth Amendment's application to their conduct is unclear, and because the Bellingham Defendants reasonably relied on the City's right to review Bayview's financial records, as created by the Agreement.
 
 
 24
 The State Defendants claim that they did not participate in the seizure of the DeBoers' property, arrived at Bayview after the City employees had already delivered the January 31, 1995 termination letter to DeBoer, and removed those financial records given to them by the City the following day for an audit at the City's request. The district court, however, did not reach these contentions because the DeBoers conceded that the State Defendants would be entitled to qualified immunity if the district court had properly decided the issue with respect to the Bellingham Defendants. Therefore, the parties stipulated to, and the court ordered, the dismissal of the DeBoers' Fourth Amendment claim against the State Defendants.
 
 
 25
 We review the district court's grant of qualified immunity de novo. See Blueford v. Prunty, 108 F.3d 251, 253 (9th Cir. 1997).
 
 
 26
 "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, [the official] should be made to hesitate..
 
 
 27
 . . ."Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982). However, where the official acts in an area where "clearly established rights are not implicated, the public interest may be better served by action taken `with independence and without fear of consequences.' " Id. (citation omitted). Thus, qualified immunity is provided to a public official to protect the official from a civil action for damages, as long as the official's conduct does not violate clearly established federal statutory or constitutional "rights of which a reasonable person would have known." Id. at 818.
 
 
 28
 To determine whether the individual defendants are entitled to qualified immunity, we must first identify "the specific right [they] allegedly violated." Kelley v. Borg, 60 F.3d 664, 666 (9th Cir.1995) (citing Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir.1991)). Then, we must determine "[w]hether that right was so `clearly established' as to alert a reasonable officer to its constitutional parameters." Id. If the right is not clearly established, the individual defendants are entitled to qualified immunity. See Thompson v. Souza, 111 F.3d 694, 698 (9th Cir. 1997). If the right is clearly established, we must consider whether a reasonable official could have believed that her conduct was lawful. See Kelley, 60 F.3d at 666; see also Mendoza v. Block, 27 F.3d 1357, 1360 (9th Cir. 1994); Newell v. Sauser, 79 F.3d 115, 117 (9th Cir. 1996).
 
 1. Specific Right Violated
 
 29
 In this case, the district court did not identify the specific right allegedly violated or indicate whether the right was clearly established at the time of the alleged violation. Instead, the court proceeded directly to the third inquiry: whether a reasonable official, under the circumstances, could have believed that her conduct was lawful. Because the question of "[w]hether an asserted federal right was clearly established at a particular time . . . presents a question of law," we can determine such in the first instance. Elder v. Holloway, 510 U.S. 510, 516 (1994); see also Mendoza, 27 F.3d at 1360.
 
 
 30
 In identifying the contours of the right we must strike a balance "between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." Davis v. Scherer, 468 U.S. 183, 195 (1984). The DeBoers claim that the Bellingham Defendants and State Defendants infringed their Fourth Amendment rights by unlawfully seizing their business records, equipment and other property. More specifically, the DeBoers allege that the Agreement with the City did not authorize the individual defendants to seize their business records, equipment and other property; it merely requires that financial records be "made available to the City and any other governmental agency with jurisdiction" for audit purposes. These allegations specifically identify the contours of the right allegedly violated. See Anderson v. Creighton, 483 U.S. 635, 640 (1987).
 
 2. Clearly Established Law
 
 31
 Having identified the right at issue, we must determine whether it was clearly established before January 31, 1995. "To be clearly established, the law must be `sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " Newell, 79 F.3d at 117 (quoting Anderson, 483 U.S. at 640). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640 (citation omitted). However, "when `the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." Mendoza, 27 F.3d at 1361 (quoting Casteel v. Pieschek, 3 F.3d 1050, 1053 (7th Cir. 1993)); see also Backlund v. Barnhart, 778 F.2d 1386, 1390 (9th Cir. 1985) (recognizing that "[t]here may be cases of conduct so egregious" that a constitutional violation would be apparent to any reasonable person). Thus, a constitutional right may be clearly established by common sense as well as closely analogous preexisting case law. See Newell, 79 F.3d at 117.
 
 
 32
 The Fourth Amendment provides, in pertinent part, that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." "A `seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984)."Absent such interference, no fourth amendment seizure will be found." United States v. England, 971 F.2d 419, 420 (9th Cir. 1992).
 
 
 33
 The Bellingham Defendants argue that it was not clearly established that their confiscation of private business records on City-owned premises for the purpose of securing and preserving the records for an audit, to which they were entitled under the Agreement with D & M, constituted a "seizure" under the Fourth Amendment. This contention, however, misstates the facts. First, the Bellingham Defendants confiscated more than just the business records of the DeBoers, they also seized their equipment and other property. Second, the DeBoers presented evidence that the Bellingham Defendants seized their business records, equipment and other property and subsequently performed an audit, at least in part, for a criminal investigatory purpose. Assistant City Attorney Little, testified at his deposition that part of the purpose behind the state audit was in fact to further the criminal investigation of DeBoer. He further admitted that it was his understanding that the City's intent was to investigate and see whether a crime had been committed. It is clearly established, and was at the time the DeBoers' property was confiscated and subsequently searched, that governmental conduct which "has as its purpose the intention to elicit a benefit for the government in either its investigative or administrative capacities" falls within the ambit of the Fourth Amendment. United States v. Attson, 900 F.2d 1427, 1431 (9th Cir. 1990); see also New Jersey v. T.L.O., 469 U.S. 325, 334-35 (1985).
 
 
 34
 The Bellingham Defendants assert that even if their conduct was motivated in part by a criminal investigatory purpose, pursuant to the Agreement they had a right to audit the cemetery records. Thus, they argue that they would inevitably have conducted the audit. This argument, however, confuses two distinct theories: the "inevitable discovery" exception to the exclusionary rule, see Nix v. Williams, 467 U.S. 431, 44048 (1984), and the rationale that when governmental conduct would have been the same regardless of the governmental actor's subjective state of mind, attempts to uncover the governmental actor's "true" intent serve no purpose. See United States v. Bowhay, 992 F.2d 229, 231 (9th Cir. 1993).
 
 
 35
 Under the inevitable discovery exception, evidence unlawfully obtained may be admitted at trial if the government by a preponderance of the evidence can demonstrate that the evidence would inevitably have been acquired through lawful means. See Nix, 467 U.S. at 444. The doctrine, however, does not negate the unlawfulness of the seizure and, therefore, is no bar to a S 1983 action. See Chatman v. Slagle, 107 F.3d 380, 382 (6th Cir. 1997); see also Heck v. Humphrey,512 U.S. 477, 487 n. 7 (1994) ("[A] suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the S 1983 plaintiff's still-outstanding conviction."). The question we face is not whether the audit, due to inevitable discovery, would be admissible against DeBoer in a criminal proceeding; instead, it is whether the confiscation of the DeBoers' personal property constituted a "seizure" under the Fourth Amendment, violating the DeBoers' civil rights. Accordingly, the inevitable discovery doctrine has no meaningful application here. See Chatman, 107 F.3d at 382.
 
 
 36
 The second theory encompassed in the Bellingham Defendants' argument is that the Agreement entitled them to audit the cemetery records irrespective of their purpose. See Bowhay, 992 F.2d at 231 (holding that inventory search was not invalidated because the officer viewed the search as both an investigative and an inventory search); see also United States v. Lillard, 929 F.2d 500, 502 (9th Cir. 1991) (holding that arrest was not pretextual where officer knew of defendant's suspected methamphetamine manufacturing but "would have stopped him anyway because of his speeding and careless driving"). In Bowhay, we concluded that because the governmental actor's "conduct would have been the same regardless" of his or her motive, "no purpose is served by attempting to tease out the officer's `true' motivation." 992 F.2d at 231.
 
 
 37
 The Bellingham Defendants aver that the Bowhay rationale applies with equal force to their conduct because they would nevertheless have performed the audit pursuant to the Agreement. This argument fails for the simple reason that the conduct at issue is not the audit but the seizure of the DeBoers' property. The fact that the Bellingham Defendants may inevitably have performed the audit is no bar to the DeBoers' Fourth Amendment claim. See Chatman, 107 F.3d at 382. In both, Bowhay and Lillard, the challenged conduct was supported by legitimate grounds and, therefore, was constitutional despite the existence of additional illegitimate grounds.[5] The Bellingham Defendants, however, did not possess any legitimate ground for seizing the DeBoers' property. The audit rights do not provide a legitimate basis for the seizure. The Agreement clearly did not authorize the Bellingham Defendants to seize the DeBoers' business records, equipment or other property under threat of arrest for purposes of the audit. We find that the Bellingham Defendants' conduct was so egregious that a constitutional violation would have been apparent to reasonable officials without any guidance from the courts. See Mendoza, 27 F.3d at 1361. Therefore, regardless of whether the Bellingham Defendants seized the DeBoers' property for a criminal investigatory purpose or solely for the purpose of securing and preserving the audit, we conclude that the DeBoers' Fourth Amendment right to be free from unreasonable seizure of their business records, equipment and other property was clearly established, and that this right was not diminished by the Agreement.
 
 
 38
 3. Objective Reasonableness of Official Conduct
 
 
 39
 Qualified immunity may shield officials who conduct an unreasonable search or seizure which violates an individual's rights if a reasonable person in the position of the official could have believed that her conduct was lawful. See Mendoza, 27 F.3d at 1362 ("qualified immunity is available if a reasonable official could have believed the conduct at issue was lawful"); see also Anderson, 483 U.S. at 641; Osolinski v. Kane, 92 F.3d 934, 936 (9th Cir. 1996) (qualified immunity is available where, "in light of clearly established principles governing the conduct in question, the official objectively could have believed that his conduct was lawful"); Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir. 1993) (same). The inquiry is whether in light of the totality of the circumstances the defendants' actions were "objectively reasonable." See Mendoza, 27 F.3d at 1362.
 
 
 40
 The district court ruled that the Bellingham Defendants were entitled to qualified immunity because "reasonable officials in [the Bellingham Defendants'] position, concerned that records be preserved, objectively could have believed that the [C]ity had a right to enter the office on[C]ity property and take possession of records to which the [C]ity had a contractual right of access," regardless of whether this conduct was actually lawful. We disagree.
 
 
 41
 Reasonable officials in the Bellingham Defendants' position could not objectively have believed that their conduct was lawful. Article V of the Agreement sets forth D & M's obligation to maintain accounting records and states that "[f]inancial records for audit purposes shall be made available to the City . . . ." The Bellingham Defendants assert that they interpreted this language to entitle City officials to take possession of Bayview's financial records for audit purposes. As discussed above, the Agreement in no way authorized the Bellingham Defendants to seize D & M's records or the DeBoers' other property. Reasonable officials would not have interpreted the contract to authorize such. Moreover, the Bellingham Defendants' current interpretation of the contract is inconsistent with their conduct at that time. The Bellingham Defendants attempted to obtain the records by having the State Auditor's Office subpoena them and perform an audit. When the State Auditor's Office refused to exercise its subpoena power, the Bellingham Defendants sought to procure the records by way of a warrant. These actions are inconsistent with and unnecessary to the Bellingham Defendants' current interpretation of the Agreement. Reasonable officials would not have pursued those ends if they believed they were entitled to take possession of D & M's records.
 
 
 42
 Additionally, even if we assume, as concluded by the district court, that reasonable officials, concerned that Bayview's records be preserved, objectively could have believed that they had a right to enter City-owned premises and pursuant to the Agreement take possession of Bayview's records, reasonable officials could not have objectively believed that the Agreement empowered them to deprive the DeBoers of their possessory rights to their personal records, equipment, and the financial records of Cascade Memorials. The January 31, 1995 termination letter directed DeBoer "to remove himself from the Cemetery premises immediately and . . . to leave on the premises all records and property of whatever nature pertaining to Cascade Memorials and D & M Operating Company." This directive was carried out under threat of arrest. The Agreement cannot objectively be interpreted to enable the Bellingham Defendants to deprive the DeBoers of any property pertaining to Cascade Memorials and D & M.
 
 
 43
 Consequently, the facts alleged by the Bellingham Defendants cannot support a reasonable belief that their conduct was lawful. Accordingly, the Bellingham Defendants are not entitled to qualified immunity. See Act Up!/Portland, 988 F.2d at 873 (finding that if the facts alleged by defendant could not support a reasonable belief that his conduct was lawful, he is not entitled to qualified immunity). We,therefore, conclude that the district court erred in granting qualified immunity in favor of the Bellingham Defendants and denying the DeBoers' cross-motion on the issue.
 
 
 44
 The record before us is unclear as to the State Defendants' involvement in the events of January 31, 1995 or their knowledge of events prior thereto. Pursuant to the stipulation of the parties that if the Bellingham Defendants are entitled to qualified immunity so too are the State Defendants without need of a formal summary judgment motion, the district court dismissed the DeBoers' claims against the State Defendants with prejudice. This court cannot, at this time, determine whether the actions of the State Defendants were objectively reasonable in light of the clearly established law. We therefore vacate the dismissal to permit the district court to address on remand the separate contentions of the State Defendants.
 
 B. Due Process Claim
 
 45
 The DeBoers maintain that the district court erred in granting summary judgment in favor of the Bellingham Defendants on the DeBoers' Fourteenth Amendment claim because the Agreement created a constitutionally protected property interest subject to procedural due process.
 
 
 46
 The Fourteenth Amendment protects individuals from deprivation of property interests by the government without procedural due process. Due process is violated where there exists: (1) a constitutionally protected property interest; (2) the government's deprivation of said interest; and (3) a lack of process. See Portman v. County of Santa Clara, 995 F.2d 898, 904 (9th Cir. 1993).
 
 
 47
 1. Constitutionally Protected Property Interest
 
 
 48
 In determining whether the DeBoers possessed a constitutionally protected property interest, we must examine what interest was held, and whether that interest is afforded federal due process protection. See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569-70 (1972)."[A] contract with a state entity can give rise to a property right protected under the Fourteenth Amendment." Unger v. National Residents Matching Program, 928 F.2d 1392, 1397 (3d Cir. 1991) (citing Perry v. Sindermann, 408 U.S. 593, 599-601 (1972)). The Bellingham Defendants contend that because DeBoer is not a party to the contract with the City, he cannot assert a due process claim.
 
 
 49
 The contracting parties on the face of the Agreement are the City and D & M, "a Washington State partnership." DeBoer, however, presented evidence, giving rise to a triable issue of material fact, that although D & M had once been a partnership, with DeBoer and his father as the partners, as of 1988 he took over full ownership and was the sole proprietor of D & M. A partnership, as defined by Wash. Rev. Code S 25.05.005(6), is "an association of two or more persons to carry on as co-owners a business for profit . . . . " Because when reviewing a grant of summary judgment, we view the evidence in the light most favorable to the non-moving party, see Warren, 58 F.3d at 441, we accept, only for the purpose of this appeal, that DeBoer was the sole owner of D & M at the time the parties entered into the Agreement.[6] We, therefore, must reach the substance of DeBoer's due process claim.
 
 
 50
 While all public contracts bestow various legal rights on the contracting entity under state law, not all public contracts necessarily invoke the protection of the Due Process Clause. See San Bernardino Physicians' Services Medical Group, Inc. v. County of San Bernardino, 825 F.2d 1404, 1408-09 (9th Cir. 1987); see also Reich v. Beharry, 883 F.2d 239, 242 (3d Cir. 1989) ("[A]lthough state contract law can give rise to a property interest protectible by procedural due process, not every interest held by virtue of a contract implicates such process."); Yatvin v. Madison Metro. Sch. Dist., 840 F.2d 412, 416 (7th Cir. 1988); S & D Maintenance Co. v. Goldin, 844 F.2d 962, 965-67 (2d Cir. 1988) ("[W]e hesitate . . . to constitutionalize contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor."). Thus, our problem, then, is "to distinguish between `mere' contract rights and [constitutionally protected] property rights created by contract." Yatvin, 840 F.2d at 416.
 
 
 51
 In Unger, the Third Circuit identified two general types of public contract rights that give rise to property interests protected under the Due Process Clauses of the Fifth and Fourteenth Amendments. The "first type arises where the contract confers a protected status" due to extreme dependence, as is the case with welfare benefits, or permanence, as is the case with tenure, " `or sometimes both, as frequently occurs in the case of social security benefits.' " Unger , 928 F.2d at 1399 (quoting S & D Maintenance, 844 F.2d at 966). The second type arises where the contract itself contains a provision that the governmental entity can terminate the contract only for cause. See id. (citing S & D Maintenance , 844 F.2d at 967).
 
 
 52
 a. Contract Conferring Protected Status
 
 
 53
 In San Bernardino, we considered whether the contract between the county and the plaintiff, a corporation whose employees provided medical services to the county, constituted the first type of public contract described in Unger and conferred on the plaintiff the protected status afforded tenured employment. Although we found that the medical services the corporation contracted to supply the county depended on the personal services of its employees, the expectation of continued employment of its employees depended not on the corporation's contract with the county, but on the corporate employees' contract with their employer, the corporation. See San Bernardino, 825 F.2d at 1409. The plaintiff corporation's relationship with the county, however, was that of a supplier, not an employee. See id. Accordingly, we refused to extend to the plaintiff the constitutional protection afforded tenured employees. See id. at 1409-10.
 
 
 54
 The Bellingham Defendants contend that DeBoer's due process claim fails because the City's contract with D & M is a supply contract similar to the one in San Bernardino. Pursuant to the specific terms of the Agreement, D & M's relationship with the City was one of an independent contractor, not an employee. Article XI of the Agreement unequivocally states, "The parties intend that the Manager [(D & M)] shall be an independent contractor in the performance of the services rendered" to the City, and,"[n]either Manager, his subcontractor, nor any employees of the foregoing shall be deemed to be employees of the City for any purpose."
 
 
 55
 While an independent contractor who contracts with a public agency to provide her personal services may possess a property interest protected by the Fourteenth Amendment, see San Bernardino, 825 F.2d at 1409 n.5 (citing Farr v. Chesney, 437 F. Supp. 521 (D.C. Pa. 1977)), the Agreement between the City and D & M did not call for the personal services of DeBoer. Although DeBoer is listed as the party responsible for D & M, nothing in the Agreement suggests that the personal services of DeBoer or any other individual were essential to its performance. In fact, the Agreement explicitly contemplates that D & M ensure "adequate personnel" are on duty to serve the public and maintain Bayview's "buildings and facilities in a clean, well-kept and orderly condition . . . ." See Agreement, Article VII, Section B. Moreover, under the Agreement, D & M is required to provide such personnel as well as equipment and supplies for the efficient and satisfactory operation of the cemetery. See Agreement, Article VIII, Sections A and F.
 
 
 56
 D & M, like the corporation in San Bernardino, contracted with the City to supply the personal services of its employees. See id. at 1409. It also agreed to provide equipment and supplies. Hence, the Agreement between the City and D & M is a supply contract, not an employment contract to provide the personal services of DeBoer. Accordingly, it does not confer upon DeBoer the protected status rendered tenured employees.
 
 
 57
 b. Contract Terminable Only for Cause
 
 
 58
 In addition to contracts conferring protected status, Unger and S & D Maintenance recognized a second type of contract that gives rise to a due process protected property interest; to wit: a public contract terminable only for cause. See Unger, 928 F.2d at 1399; S & D Maintenance, 844 F.2d 967. Although the public contract in San Bernardino was terminable only for cause, the Board of Supervisors for the county decided to rescind the termination notices prior to plaintiff corporation's institution of the action. See id. at 1406-09. Therefore, the court did not, nor did it have occasion to, consider the procedural due process question in the context of a termination without cause where the contract specifically contained a provision that the contract could only be terminated for cause. See id. at 1406-09. Here, however, the City terminated the Agreement. Therefore, we must determine whether the Agreement was one which could be terminated only for cause.
 
 
 59
 The Bellingham Defendants contend that Article X, Section B of the Agreement provides that the "Agreement may be terminated for the convenience of the parties by written request . . . ." Article X, Section B, however, goes on to provide in no uncertain terms that "[i]f the other party does not agree to the proposed termination within sixty (60) days of the receipt of the request, the matter shall be handled as a termination for cause as set forth above." Section B then refers to Article X, Section A, which states, in pertinent part, that "[s]hould the City for any reason desire to terminate this Agreement for cause, the Director of Parks and Recreation shall forthwith provide written notice thereof to the Manager, specifying the cause." Accordingly, under the terms of the Agreement, one party could not unilaterally terminate the Agreement for convenience; it had to do so for cause. The agreement between the City and D & M, therefore, creates a legitimate claim of entitlement in DeBoer protected by the Due Process Clause of the Fourteenth Amendment, assuming of course that DeBoer is the sole-proprietor of D & M. See Unger 928 F.2d at 1399; see also S & D Maintenance, 844 F.2d at 967-68.
 
 2. Deprivation and Lack of Process
 
 60
 We must next determine whether DeBoer was deprived of his constitutionally protected property interest in violation of his due process rights. As required by the Agreement, the City sent DeBoer a letter dated December 13, 1994, notifying DeBoer of its intent to terminate the Agreement for convenience pursuant to Article X, Section B, and for cause pursuant to Article X, Section A. By letter dated December 28, 1994, an attorney representing DeBoer, responded to the City's letter. The response indicated that DeBoer wished to exercise his right to take the full sixty days to decide whether to terminate for convenience; moreover, the response separately addressed each ground for termination for cause cited by the City and explained that each had been eliminated. Thereafter, the City served DeBoer with the January 31, 1995 termination letter which instructed him to immediately leave the premises without property or records and that the Agreement was terminated effective in fifteen days. The Bellingham Defendants, therefore, presented DeBoer no opportunity to correct or eliminate the cause stated for the termination and forced him to leave the premises. Accordingly, we find the trial court erred in granting summary judgment in favor of the Bellingham Defendants on DeBoer's due process claim.
 
 C. Conclusion
 
 61
 The district court's grant of summary judgment in favor of the Bellingham Defendants on their defense of qualified immunity to the DeBoers' Fourth Amendment claim and the district court's denial of partial summary judgment on the DeBoers' cross-motion on the qualified immunity defense are reversed and remanded. Upon remand, the district court is directed to enter partial summary judgment in favor of the DeBoers on the Bellingham Defendants' qualified immunity defense to the Fourth Amendment claim.
 
 
 62
 The district court's grant of summary judgment in favor of the Bellingham Defendants on the DeBoers' due process claim is reversed and remanded for further proceedings consistent with this opinion.
 
 
 63
 The order approving the stipulation dismissing the DeBoers' Fourth Amendment claim against the State Defendants is vacated and remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 *
 The Honorable Robert M. Takasugi, Senior United States District Judge for the Central District of California, sitting by designation.
 
 
 [1]
 A. Suspension and Termination for Cause:
 1. If, through any cause, the Manager fails to fulfill in a timely and proper manner its obligations under this Agreement; or if it violates any of the terms of this Agreement; or if it violates appli cable laws, rules, regulations, or ordinances of any governmental body with jurisdiction; or if the work done by the Manager is unsatisfactory to the City's Director of Parks and Recreation, this Agreement may be terminated as provided herein.
 2. Should the City for any reason desire to terminate this Agree ment for cause, the Director of Parks and Recreation shall forth with provide written notice thereof to the Manager, specifying the cause. Upon receipt of written notice, the Manager shall have fif teen (15) days within which to eliminate the cause of termination.
 3. At the end of such period, this Agreement shall be automati cally terminated.
 B. Termination for Convenience: This Agreement may be terminated for the convenience of the parties by written request, made a part hereof and executed in the same manner as this Agreement. The party desiring termination shall request such ter mination of the other party in writing. If the other party does not agree to the proposed termination within sixty (60) days of receipt of the request, the matter shall be handled as a termination for cause as set forth above, following which there will be an equitable adjustment of any amounts owed by either party to the other.
 
 
 [2]
 A. Manager shall keep full accounting records of all business done at the Bayview Cemetery in accordance with generally accepted accounting principles.
 B. Financial records for audit purposes shall be made avail able to the City and any other governmental agency with jurisdic tion, and shall be retained by the Manager for at least three (3) years following termination or expiration of this Agreement.
 
 
 [3]
 The seven City Council members named in the Complaint are Bruce Ayers, Louise Bjornson, Arne Hanna, Pat Rowe, Don Gischer, Gene Knutson and Bob Hall.
 
 
 [4]
 The Fourth Amendment applies to the States by way of the Fourteenth Amendment. See Mapp v. Ohio, 367 U.S. 643, 655 (1961).
 
 
 [5]
 In Bowhay, lawfulness of the defendant's arrest was not in issue, it was the subsequent inventory search at the police station that defendant sought to suppress. See 992 F.2d at 230. In Lillard, defendant's speeding and careless driving justified the stop, and the officers' recognition of the distinct odor emanating from defendant's van as being associated with the manufacture of methamphetamine, coupled with their suspicion that defendant was making the drug, supported the conclusion that there was probable cause to arrest defendant. See 929 F.2d at 502.
 
 
 [6]
 Because a triable issue of material fact exists that DeBoer was the sole owner of D & M at all times relevant to this action, we need not decide the issue of whether DeBoer, in his capacity as partner of D & M, could have asserted a due process claim on behalf of the partnership. Additionally, because it is not raised on appeal nor was it raised below, we do not reach whether Luanne DeBoer's due process claim differs in any way from that of Dean DeBoer.
 
 
 TASHIMA, Circuit Judge, concurring:
 
 64
 I concur fully in Parts I, II.A, II.B.2, and II.C of the majority opinion. I also concur in the result reached in Part II.B.1, but I reach that result by a differently-reasoned route.[1]
 
 
 65
 As the majority opinion points out, by the time the events giving rise to DeBoer's termination occurred, D & M Operating Company had been transformed from a two-person partnership to a sole proprietorship.[2] See slip op. at 3148. The City's termination letter of January 31, 1995, recognizes DeBoer as "the principal" of D & M. Article I of the Agreement provides that "this Agreement is one for personal services." (Emphasis added.) Apparently the City (whose attorney drafted the Agreement) thought this point of sufficient importance that Article XI.A reiterates that"[t]his agreement is for the performance of professional services." Article XI.B goes on to provide that "[n]one of the services covered by this Agreement shall be subcontracted by the Manager without prior written consent of the City . . . . " Upon the City's insistence in late 1994, DeBoer withdrew from his other business ventures to devote his full time to the management of the cemetery. All indicia are that this was a five-year, personal service contract, terminable only for cause.
 
 
 66
 This is precisely the question we left open in San Bernardino Physicians' Serv. Med. Group, Inc. v. County of San Bernardino, 825 F.2d 1404, 1409 (9th Cir. 1987) ("[W]e do not suggest that employment contracts are the only kind that may be entitled to Fourteenth Amendment protection."). We further noted that "Physicians' Group's contract to supply the services of others is to be distinguished from an individual's contract to supply his or her own services." Id. at 1409 n.5 (citing Farr v. Chesney, 437 F. Supp. 521 (D.C.Pa. 1977)).
 
 
 67
 Viewing the evidence in the light most favorable to DeBoer, this Agreement was an agreement for DeBoer to supply his own personal services to the City. I would thus hold, on summary judgment, that DeBoer has raised a material issue of fact whether the Agreement can be construed as an agreement by the City to employ DeBoer to supply his own personal services, for a term certain, which could be terminated only for cause. If so, in Judge Canby's words, the Agreement would easily fall within "that large body of precedent holding that an employment contract under which a state employee may be discharged only for `cause' creates a constitutionally protected property interest." Slip op. at 3155 (Canby, J., concurring and dissenting) (citing Perry v. Sinderman, 408 U.S. 593, 601 (1972)).
 
 
 68
 For the above reasons, I agree with Judge Takasugi's conclusion that "[t]he Agreement between the City and D&M,therefore, creates a legitimate claim of entitlement in DeBoer protected by the Due Process Clause of the Fourteenth Amendment . . . ."
 
 
 
 Notes:
 
 
 [1]
 As I set out below, I disagree with both the analysis and result reached in Part II.B.1.a, and do not reach the issue resolved in Part II.B.1.b.
 
 
 [2]
 Since this case comes to us on appeal from the grant of summary judgment in favor of the City, I view the evidence in the light most favorable to DeBoer and draw all reasonable inferences in his favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).
 
 
 
 69
 CANBY, Circuit Judge, concurring in part and dissenting in part:
 
 
 70
 I concur fully in that part of Judge Takasugi's opinion which holds that the Bellingham defendants are not entitled to qualified immunity with regard to DeBoer's Fourth Amendment claims.[1]
 
 
 71
 My disagreement with the majority is over DeBoer's due process claim. In my view, the contract between the City and D & M Operating Company, of which DeBoer was a partner, created no due-process-protected property interest in DeBoer that protects him against a breach by the City. As the majority opinion indicates, the City's contract was not a contract of employment, nor was it even a contract for DeBoer's personal services as an independent contractor. It therefore does not fall within that large body of precedent holding that an employment contract under which a state employee may be discharged only for "cause" creates a constitutionally protected property interest. See Perry v. Sinderman , 408 U.S. 593, 601 (1972).
 
 
 72
 The majority, however, concludes that DeBoer's interest is protected because the contract between his firm and the City could be terminated unilaterally by the City only for "cause." In so holding, I believe that the majority contravenes San Bernardino Physicians Serv. Med. Gp. v. County of San Bernardino, 825 F.2d 1404 (9th Cir. 1987). There we held that a corporation's contract to provide medical services to the County, terminable only for "cause," did not create a constitutionally protectible interest because the corporation stood "in the position of supplier, not employee." Id. at 1409. We declined to extend due process protection to such contracts because "[i]t is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a state into a federal claim."[2]Id. at 1408.
 
 
 73
 The same considerations control here.[3] The D & M partnership contracted to supply services to the City, and the contract was terminable by the City for "cause," with D & M to be given an opportunity to correct the cause-creating defect. The City terminated without following these provisions, and thereby breached its contract.[4] D & M has a remedy for that breach under state law.[5]
 
 
 74
 The majority relies upon a dictum in Unger v. National Residents Matching Program, 928 F.2d 1392 (3d Cir. 1991), that property interests are created by contract in two classes of cases: (1) where the contract confers a protected status, either of extreme dependency such as welfare benefits, or of tenure for employees; and (2) where the contract includes a provision that it is terminable only for cause. See id. at 1399. With all respect, I do not believe that the second category extends to the ordinary business contract. The only holdings Unger cites for its second category are employment cases. See id. (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-39 (1985); Arnett v. Kennedy, 416 U.S. 134, 166-67 (1974)). Unger also catalogs numbers of decisions, including San Bernardino, that support the proposition that all state breach-of-contract cases ought not to be turned into constitutional cases. See Unger, 928 F.2d at 1397-99.
 
 
 75
 There is a very important reason why the presence of a clause providing termination for "cause" should not convert rights under a business contract into property protected by the due process clause. In the employment cases, a contractual provision that employment may be terminated only for "cause" merely establishes the entitlement to an expectation of continued employment, which triggers the constitutional protection. See Perry, 408 U.S. at 601. By this logic, a contract of employment for a fixed term is also entitled to due process protection, because it provides for no termination at all during the specified term. Indeed, we have so held. See Stretten v. Wadsworth Veterans Hospital, 537 F.2d 361, 367 (9th Cir. 1976); see also Vanelli v. Reynolds School Dist. No. 7, 667 F.2d 773, 777 (9th Cir. 1982).
 
 
 76
 By the same reasoning, if we are to afford due process protection to state business contracts because they contain a provision for termination only for "cause," then we must extend due process protection to state business contracts that extend for a fixed term whether or not they contain "cause" provisions. Certainly the state should occupy no stronger position when it contracts for ten years with no right to terminate for cause, than it would if it had contracted for ten years and provided that it could terminate the contract for cause. Thus, a huge portion of ordinary commercial breach of contract cases will be converted into due process constitutional cases when the state is the breaching party. Rather than run the risk of "convert[ing] every breach of contract claim against a state into a federal claim," San Bernardino, 825 F.2d at 1408, I would exclude these commercial contracts from the category of due-process-protected property, despite the presence of a "cause" termination clause or a fixed term.
 
 
 77
 In all other respects, I agree with the majority opinion.
 
 
 
 Notes:
 
 
 [1]
 I also agree that the judgment granting qualified immunity to the state defendants, which was entered on the strength of the ruling in favor of the Bellingham defendants, must be reversed. The district court may then address the degree, if any, to which the actions of the state defendants differed materially from the actions of the Bellingham defendants.
 
 
 [2]
 The majority opinion asserts that San Bernardino did not have occasion to consider the effect of the "cause" requirement because the County had rescinded the termination notices before trial. But the plaintiffs there continued to assert a due process claim based on their contract. San Bernardino therefore still had to consider, and did consider, whether the contract (with its "cause" requirement for termination) was constitutionally-protected property. In deciding it was not property, San Bernardino did not rely at all on the fact that termination had been rescinded; the rescission appears only in the recitation of facts and played no part in our reasoning. See San Bernardino , 825 F.2d at 1406.
 
 
 [3]
 We are not confronted with a situation where some other governmental agency confiscated D & M's contractual rights which the City was still prepared to honor. Such a scenario would raise entirely different constitutional considerations from those presented by the City's breach as a contracting party.
 
 
 [4]
 Because we are reviewing a summary judgment for the defendants, I accept DeBoer's version of the facts for purposes of appeal.
 
 
 [5]
 O'Hare Truck Service, Inc. v. City of Northlake, 116 S.Ct. 2353 (1996), does not aid DeBoer. There the Supreme Court held that a towing company could not be removed from the City's referral list (which was governed by a "cause" requirement for removal) because of its political activity or inactivity. The Court refused to differentiate First Amendment rights of employees from those of independent contractors. See id. at 2359. First Amendment rights, however, ordinarily do not depend on contractual status, while contractual property rights necessarily do. O'Hare does not control this case.