UNITED STATES of America, Plaintiff–Appellee,

v.

Joseph CHUKWUBIKE, Defendant–Appellant.

No. 91–50185.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 9, 1992.

Decided Feb. 6, 1992.

Paul L. Abrams, Deputy Federal Public Defender, Los Angeles, Cal., for defendant-appellant.

Christopher Painter, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before FARRIS, NOONAN, and TROTT, Circuit Judges.

NOONAN, Circuit Judge:

Joseph Chukwubike appeals the denial of his motion to suppress evidence in connection with his conditional plea of guilty to one count of violating 21 U.S.C. §§ 952(a) and 960(a)(1) (1988) by importing heroin and one count of violating 21 U.S.C. § 841(a)(1) (1988) by possessing heroin with intent to distribute. The issue presented by the case is this: whether doctors acting to save the life of a drug courier carrying balloons of heroin in his stomach should be regarded as government agents conducting a search governed by the Fourth Amendment. We conclude that they should not be so characterized. Consequently, we affirm the denial of Chukwubike's motion to suppress and affirm his conviction.

## PROCEEDINGS

On November 13, 1990 Chukwubike was indicted for the importation of 753 grams of heroin and possession with intention to distribute. On December 18, 1990 he filed a motion to suppress the evidence obtained as a result of his detention at the border. On January 22, 1991, after an evidentiary hearing, the court denied his motion. On February 4, 1991 he entered conditional pleas of guilty to both counts, reserving the right to appeal the denial of the motion to suppress. On March 14, 1991 he was sentenced to five years in custody on each count, the time to run concurrently, and to four years supervised release upon his release from custody. He now appeals the denial of his motion to suppress.

## FACTS

Joseph Chukwubike is a citizen of Nigeria. About 3:00 p.m. October 17, 1990 he was observed by customs officials in the primary immigration line at the Los Angeles airport. On being engaged in conversation by them he gave inconsistent and implausible accounts of his purpose in coming to the United States from Nigeria and was referred to secondary inspection.

At secondary inspection Chukwubike continued to spin inconsistent stories. His briefcase was found to contain pills that appeared to be Lomotil, an antidiarrhea medicine, often used by body cavity smugglers to prevent narcotics from passing through their system before they enter the United States. Chukwubike's lips were

dry, a condition consistent with one taking antidiarrhea medication.

Chukwubike was informed that he was suspected of carrying narcotics within his body and asked if he would consent to an x-ray. He refused to consent. By this time Chukwubike appeared extremely uncomfortable in his sitting position, was constantly moving as if to relieve pressure on his lower extremities and was continually rubbing his abdominal area. He sat with his pants unbelted as if to relieve pressure on the middle of his body.

At 6:30 p.m. customs officials transported Chukwubike to Centinela Medical Clinic where they continued to monitor him. He twice refused to take food or water. At 4:00 a.m. the following day, October 18, Chukwubike collapsed in his chair and became unconscious. Medical staff injected him with Narcan, a drug used to counteract drug overdoses. He regained consciousness and was transferred by ambulance to the emergency room of Daniel Freeman Marina Hospital.

At 7:00 a.m. the morning of October 18 he came under the care of Dr. Dean Steele who met with him for an hour and advised him that an x-ray of his abdominal area was necessary for medical purposes. Dr. Steele told him that he risked death if he refused the x-ray. Chukwubike refused to consent. Despite the refusal Dr. Steele took the x-ray at 8:40 a.m. It revealed 50 oval-shaped, balloon-like objects in Chukwubike's gastrointestinal tract. Customs agents were present and observed the results of the x-ray.

Later in the morning Chukwubike was transported to the Los Angeles County Medical Center Jail Ward. At 6:00 p.m. he lapsed into unconsciousness. The medical staff determined that it was medically necessary to remove balloons digitally from his rectal area. The doctors removed eight such balloons. Slicing open one of the balloons they discovered that it contained a fine white powdery substance. Medical tests of Chukwubike's urine revealed the presence of heroin.

Dr. Richard Gelb, a senior resident at Los Angeles County/U.S.C. Medical Center was now in charge of Chukwubike. He observed that Chukwubike had difficulty breathing and believed that he could be suffering from Adult Respiratory Distress Syndrome, a well-known side effect of an overdose of heroin. In order to investigate this hypothesis he employed a fiber optic camera to observe Chukwubike's stomach. With this instrument it was also possible to pass wires and pincers into the stomach to extract items from it. The pincers were used to grasp a piece of tape that had unraveled from one of the balloons and to remove the tape from Chukwubike's stomach.

Chukwubike was now moved to the intensive care unit and placed under the care of Dr. Andrew Nathanson. Dr. Nathanson consulted a toxicologist at the hospital, who advised him that it was medically necessary to test a sample of the substance in one of the balloons already removed from Chukwubike. The hospital did not have a field test kit of its own for such testing, so Dr. Nathanson requested the use of the field test kit of a government agent who was present. The substance inside the balloon tested positive for heroin.

From October 19 through October 23, 1990 Chukwubike remained in a semi-conscious state in intensive care. During that time medical staff digitally removed heroin balloons from his rectum and other balloons were passed through his bowel movements. In all, 66 balloons were expelled. On October 23, medical staff determined that Chukwubike still had balloons in his stomach and was having difficulty passing them. The staff feared the balloons would unwrap causing the heroin to enter his bloodstream and kill him. Dr. Richard Stall operated on him and removed an additional 27 balloons from his stomach and rectum.

All balloons removed from Chukwubike were turned over to federal agents after they had been examined by the pathology department. No court order for the x-ray or other procedures was obtained by the government. A warrant for Chukwubike's arrest was issued at 4:00 p.m. on October 23, during the operation.

At the suppression hearing the court found as a fact that the medical procedures were performed solely for medical reasons and not at the request, advice or encouragement of any federal law enforcement agency. The court declared: "The operation and removal of the balloons was based on the medical opinion of the treating physicians that such a procedure was necessary to protect the life of the patient."

Chukwubike appeals.

### ANALYSIS

In his brief Chukwubike concedes that he "does not challenge the district court's conclusion that the customs agents had reasonable suspicion to initially detain him for a monitored bowel movement or a consensual x-ray, pursuant to *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1984)." According to the analogy drawn in that case, a smuggler carrying drugs within his body is like an entrant to the country suffering from tuberculosis. In either case, the suspected carriers can be "detained until their bodily processes dispel the suspicion that they will introduce a harmful agent into this country." *Id.* at 544, 105 S.Ct. at 3312. Chukwubike was detained for six days—a very long time. But as in *Montoya de Hernandez*, the length of his detention resulted solely from the method by which he chose to smuggle drugs in the country.

Chukwubike vigorously argues that the doctors were the agents of the government and that their invasion of his body was a search governed by the Fourth Amendment. The government transported him to the clinic and the two hospitals and, accompanied him when he was x-rayed, filmed by fiber optic camera and operated upon. The government supplied the field test kit to the doctor to test the drugs and showed the doctors how to perform the test. The balloons containing the drugs were turned over to the agents as they were expelled from Chukwubike's body.

Chukwubike's contention is not without some plausibility. Nevertheless, the district court was not clearly erroneous in finding that at each point in his medical treatment the doctors acted because they believed their actions were necessary to preserve his life. Invasions of the body by doctors for medical purposes are neither a search nor a seizure. *United States v. Attson*, 900 F.2d 1427, 1433 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 393, 112 L.Ed.2d 403 (1990).

In *Attson* the defendant had given consent to the taking of a blood sample and the hospital did not turn over the blood taken until subpoenaed by a grand jury. Chukwubike's absence of consent and the prompt turning over of the balloons to the federal agents distinguish his case from *Attson*. The distinctions exist. They do not create a substantial difference. No evidence was introduced by Chukwubike to contradict the doctors' testimony that they acted as they did for medical reasons. Under normal circumstances, of course, they should have had their patient's consent. But their judgment remained a medical one. It was not nullified by Chukwubike's refusal to give permission.

Once the balloons of heroin were removed or expelled from Chukwubike's body the doctors had no right or duty to keep them from the federal agents. The balloons certainly, or at least probably, contained contraband. They were subject to immediate confiscation.

Chukwubike, nonetheless, suggests that at some point a court order should have been obtained by the government. As the government was not conducting a search, there was no requirement for the government to obtain a warrant.

The method of smuggling chosen by Chukwubike put him at great physical risk. It was a crude and disgusting way of transporting anything meant to be consumed by another human being. It required the mule, if successful, to deliver the drugs as part of his own feces. It resulted in the present case in the mule nearly dying. The grossness of the method chosen by the defendant colors the case but does not reflect upon the agents of the government who properly detained him and monitored him; still less does it reflect upon the phy-

sicians who, in saving his life, necessarily produced the evidence that convicted him of two felonies.

AFFIRMED.