Cedric **SAULSBERRY**, Plaintiff,

v.

**MARICOPA COUNTY, Jason S. Leiher, as deputy sheriff and as an individual; Dr. Mishra; B. Moyer, as deputy sheriff and as an individual; Mitch D. Field, as deputy sheriff and as an individual; Lieutenant Rankin, as deputy sheriff and as an individual, Defendants.**

**No. CIV 98–2035 PHX LOA.**

United States District Court, D. Arizona.

March 29, 2001.

Joseph Earl Collins, Collins & Collins, Phoenix, AZ, for Cedric Saulsberry.

Cedric Saulsberry, Phoenix, AZ, pro se.

Richard L. Strohm, Law Offices of Richard L. Strohm, Scottsdale, AZ, for Jason S. Leiher, Dr. Mishra, RN Manion, B.

Moyer, Mitch Field, Maricopa County Sherriff's Office.

## ORDER

ANDERSON, United States Magistrate Judge.

Commencing March 5, 2001, a three-day bench trial was held in the captioned case. Plaintiff expressly limited his § 1983 claim to the Fourth Amendment only. The issue presented herein is one of first impression in the Ninth Circuit. Pursuant to Court order, the parties submitted proposed findings of fact and conclusions of law.

After review and consideration of all the evidence, the entire record and the arguments of counsel, judgment is entered for Defendants on Plaintiff's 42 U.S.C. § 1983 claim that Defendants violated his civil rights under the Fourth Amendment of the U.S. Constitution by conducting an unlawful search by inserting a catheter into Plaintiff's penis to obtain urine for medical purposes only without Plaintiff's consent.

## FINDINGS OF FACT

1. The parties having stipulated to Facts (1)—(7) in the Joint Pretrial Order, those facts are incorporated herein by reference. Little weight, however, was given to stipulated fact no. 7 as it is contrary to the credible evidence presented at trial.

2. On December 11, 1997 Plaintiff was sentenced for the crime of Attempted Aggravated Assault, a Class 4 felony, by a Superior Court judge, State of Arizona, to a term of 3 years of intensive probation with terms that, among others, Plaintiff be incarcerated in the Maricopa County Jail for a period of 12 months beginning on December 11, 1997 and not be released until November 22, 1998, and that the Plaintiff be placed in the work release program.

3. On January 9, 1998, Plaintiff was a convicted prisoner held at the Maricopa County jail facility, commonly referred to as "tent city" or "con tents" in Phoenix, Arizona, where he was participating in the work release program.

4. The work release program is a privileged status within the Maricopa County jail system that allows inmates to leave the jail facility during the day for employment and other lawful purposes and to return to the jail facility in the evening to spend the night in custody. Plaintiff was ordered released at 4:30 a.m. to return at 6:00 p.m., Monday through Friday.

5. Pursuant to Rules and Regulations For Inmates, an inmate on work release status is not allowed to bring extra clothing back into the tents facility. The Rules specifically provide: "No extra clothing, only the clothes you wear in."

6. Plaintiff agreed in writing to the Rules and Regulations For Inmates and acknowledged receipt of the Maricopa County Sheriff's Office In–Tents Rules and Regulations on December 17, 1997.

7. On January 9, 1998, at approximately 6:00 p.m. Plaintiff returned to con tents after being released earlier in the day for work. As Plaintiff was being checked back into the jail facility, in an area called the "dog run," Detention Officer Mitch Field discovered that Plaintiff was trying to bring into the jail extra clothing (small bag of socks), in violation of the work release Rules and Regulations. There were only two officers, Detention Officers Field and Leiher, engaged in the process of supervising, searching and checking in approximately 60 work release and work furlough inmates on this date and time.

8. When Officer Field advised Plaintiff that work release inmates were not permitted to bring in extra clothing, Plaintiff started arguing with Officer Field, claiming he had permission to bring in the clothing from his probation officer. Con-

trary to Officer Fields' verbal directive to maintain Plaintiff's hands on the fence with his back toward the officer, Plaintiff became combative and spun in an aggressive, elbow-swinging motion with a clenched fist toward Officer Field which led Officer Field to believe that Plaintiff was trying to strike Officer Field in the face. Officer Field, a large man weighing 260 lbs., then grabbed Plaintiff, a short but powerfully built man, in a "bear hug" and took Plaintiff, struggling all the while, face down to the ground. Despite resisting Officer Field's efforts to do so and exhibiting unusual strength, Plaintiff was eventually hand-cuffed as Officer Field pinned Plaintiff's body to the ground with Officer Field's knee or body. Other jail officers arrived in the area and assisted Officer Field subdue the Plaintiff.

9. On the date and evening in question, Plaintiff's attitude and demeanor were consistent with someone who had recently used illegal drugs. Plaintiff was extremely agitated, irrational, hostile using vulgar and profane language. He then became calm, apologetic, and cooperative only to revert back to his former irrational and uncooperative behavior a few moments later.

10. Former Detention Officer Moyer, no longer an employee of Maricopa County, opined that Plaintiff was under the influence of narcotic drugs as a result of Plaintiff's symptoms of being "on the nod" (sleepy) one minute and like a jack rabbit the next, with the presence of white foam on his mouth. Other jail employees expressed opinions that Plaintiff was under the influence of illicit drugs.

11. During the incident in the dog run, Plaintiff sustained a small (less than one centimeter) abrasion over his right eyebrow with little, if any, bleeding and a very minor scrape on one of his knees. Neither injuries required medical care or treatment.

12. After the incident in the dog run, Plaintiff complained of injuries including that the detention officers "broke" his back and requested a medical evaluation.

13. Lt. Rankin, the highest ranking officer on the jail premises at the time of the subject incident in the dog run, directed jail staff to take plaintiff to the correctional health care facility, which is on the grounds of the jail itself, for a medical assessment and treatment, if appropriate.

14. Dr. Chandana Mishra is a licensed physician by the State of Arizona, trained in internal medicine and endocrinology, and, per the parties' stipulation in the Joint Pretrial Order, was employed by the Maricopa County Sheriff's Office in its correctional health care facility on January 9, 1998.

15. On the day of the dog run incident, Dr. Mishra took a clinical history, conducted a medical assessment and physical examination of the Plaintiff who complained to her that he was experiencing back and neck pain as a result of injuries sustained in an altercation that day. He also complained of an inability to urinate. After performing a full physical examination of Plaintiff, Dr. Mishra recommended a rectal examination and a catherization which are routine parts of her medical investigation. She also ordered a drug screen because she believed he was under the influence of some type of medication or drug. It was important to Dr. Mishra to know what drug he had used in order to treat him properly.

16. A straight catheterization is a simple medical procedure that involves the insertion of a lubricated (usually KY jelly or other lubricant), straw-like silicon tube, approximately 14 inches in length with holes at each end, into the urethra of the penis up past the prostate gland and sphincter into the bladder. The end of the catheter must travel approximately 5 to 8

inches before entering the bladder depending upon the individual's anatomy. Urine, if any in the bladder at the time, will not exit the external end of the catheter until the catheter penetrates past the sphincter and into the bladder.

16. Dr. Mishra was concerned that if Plaintiff was unable to urinate voluntarily even though his bladder may have been full, coupled with his claim of back pain, Plaintiff might have sustained a serious neurological injury like an injury to the spinal cord or a nerve injury to the sphincter that controlled the bladder. An available clinical means for Dr. Mishra to rule out a serious neurological injury was to catheterize the Plaintiff to determine how much urine, if any, was in his bladder. If his bladder was full or partially full and he was unable to urinate voluntarily, this circumstance would likely suggest a neurological impairment that would require an immediate off-site referral to an acute care (emergency room) facility for the kind of medical care and testing that is not available at the jail's health care facility. If Plaintiff's bladder were empty of urine as confirmed by the catheterization, there would be no medical reason to believe that Plaintiff had sustained a neurological injury.

17. Dr. Mishra discussed with Plaintiff that she was going to order a rectal exam and a catherterization which are both routine tests to rule out neurological involvement.

18. Plaintiff refused the rectal exam. It was not performed solely because Plaintiff refused to give his consent to the rectal exam.

19. Dr. Mishra's practice is that if a patient is competent and refuses a medical test or treatment, she requests that the patient sign a form acknowledging the refusal. The test or treatment is then not given to or performed upon the patient. No refusal forms were signed for either the rectal exam or the catheterization because they are such routine tests.

20. After explaining the catheterization procedure and why it was medically indicated to make an accurate diagnosis, Dr. Mishra understood that Plaintiff consented and agreed to it. He did not say "no" which meant a "yes" to proceed with the catheterization.

21. Plaintiff has admitted prior to trial that he initially consented to the catheterization.

22. Dr. Mishra ordered a straight catherization and drug screen solely for medical purposes, not for use by, or at the direction of, detention staff to incriminate Plaintiff or for administrative purposes against the interests of Plaintiff. The results of these medical tests are privileged and confidential unless the patient consents to disclosure in writing.

23. During the medical exam and assessment, Plaintiff was extremely verbally abusive using vulgar and profane language, insulting and disrespectful to her as a physician and as a person

24. Dr. Mishra instructed Nurse Kathleen Mannion, R.N. on the catheterization plan which was if Plaintiff could not void, the nurse was to catheterize the patient. Dr. Mishra then left the examination room while the catheterization was performed to collect the urine sample for urinalysis and drug screen.

25. If a male patient is relaxed and cooperative, there may be some minor discomfort with a catheterization but neither pain nor blood is usually present.

25. Sometime shortly before or at the onset of the catherization procedure, which was conducted first by an unidentified male nurse and then by Nurse Mannion, Plaintiff withdrew his consent and strenuously objected thereafter to the continuation of the procedure.

26. Notwithstanding the withdrawal of Plaintiff's consent, the catheterization procedure continued while Plaintiff was forcibly held down on the examination table in the prone position by three jail employees (Detention Officers Leiher, Scott Pebler and Mike Daugherty) and the male nurse. During this time Plaintiff was screaming and violently twisting his hips back and forth, scooting around on the examination table and was kicking and raising his legs, all in an effort to frustrate the success of the catherization procedure.

26. It is unclear exactly how much time transpired between Plaintiff's withdrawal of his consent and the termination of the procedure. After approximately 6 to 10 minutes from the beginning of the procedure, Nurse Mannion withdrew the catheter from Plaintiff's penis. No urine was extracted from Plaintiff's bladder as the catheter did not likely pass through Plaintiff's sphincter into the bladder. Consequently, no urinalysis or drug screen was performed.

27. A small amount of blood was evident on the tip of the catheter upon its removal from Plaintiff's penis caused by the combination of force used by Nurse Mannion to comply with Dr. Mishra's order and Plaintiff's twisting and other motions to prevent the success of the catheterization.

28. Officer Leiher advised the Maricopa County Internal Affairs investigators that Lt. Rankin was called by Officer Leiher to come to the medical examination room where Lt. Rankin informed the officers present that it was alright for the officers to assist the medical personnel in holding down the Plaintiff during the forced catheterization.

29. The subject catheterization was not maliciously and sadistically conducted by any of the Defendants for the purpose of causing harm to the Plaintiff.

30. Plaintiff's penis injury, if any, was very minor and healed on its own without further medical complications or treatment.[1]

31. Plaintiff is not a credible witness.

32. Dr. Mishra is a credible witness.

33. Plaintiff's work release status and probation were revoked because of his altercation with Officer Field in the dog run. Plaintiff was sentenced to the Arizona Department of Corrections for violation of the terms and conditions of his probation.

34. Plaintiff experienced no criminal or administrative consequences because of his refusal to proceed with the catherization.

35. During final argument Plaintiff's counsel abandoned any claim of alleged Fourth Amendment violation for excessive use of force that may have occurred in the dog run. The only claim Plaintiff's counsel asserted at the close of all the evidence is the one related to the forced catheterization.

## CONCLUSIONS OF LAW

1. Plaintiff asserts that Defendants violated his Fourth Amendment right to be free from an unreasonable search and seizure by catheterizing him and continuing the procedure after he physically withdrew his consent.

2. To recover under 42 U.S.C. § 1983, Plaintiff must establish: (1) the deprivation of a right secured by the Constitution or laws of the United States; and (2) the deprivation was caused by a person

---

1. In the Ninth Circuit, nominal damages must be awarded if a plaintiff proves a violation of his constitutional rights whether or not the constitutional violation causes any actual damages. *Floyd v. Laws*, 929 F.2d 1390, 1401 (9th Cir.1991); *Romberg v. Nichols*, 970 F.2d 512, 521 (9th Cir.1992) (per curiam).

acting under color of state law. *Briley v. California,* 564 F.2d 849, 853 (9th Cir. 1977); *Williams v. Gorton,* 529 F.2d 668, 670 (9th Cir.1976).

3. The Supreme Court has not determined whether prison inmates retain rights cognizable under the Fourth Amendment. *Hudson v. Palmer,* 468 U.S. 517, 527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

4. The Ninth Circuit, however, recognizes that the Fourth Amendment right to be free from unreasonable searches and seizures "extends to incarcerated prisoners; however, the reasonableness of a particular search is determined in reference to the prison context." *Michenfelder v. Sumner,* 860 F.2d 328, 332 (9th Cir.1988).

5. "The phrase 'searches and seizures' connotes that the type of conduct regulated by the fourth amendment must be somehow designed to elicit a benefit for the government in an investigative ... or an administrative capacity." *United States v. Attson,* 900 F.2d 1427, 1429 (9th Cir.1990).

6. The Fourth Amendment is only implicated by governmental conduct that constitutes a search or seizure. *Id.*

7. Therefore, to determine whether the Fourth Amendment prohibits government activity, the court must first inquire whether the challenged conduct constitutes a search or seizure. *Id.* at 1429–30. This inquiry is especially appropriate where conduct falls outside of the area to which the Fourth Amendment most commonly applies – law enforcement. *Id.* at 1430.

8. The application of the Fourth Amendment to governmental conduct in a noncriminal context is limited. *Id.*

9. "[F]or conduct of a governmental party to be subject to the fourth amendment, the government party engaging in the conduct must have acted with the intent to assist the government in its investigation or administrative purposes and not for an independent purpose." 900 F.2d at 1433. (holding that where physician who was a governmental employee ordered blood alcohol analysis performed on defendant for medical reasons, the doctor's conduct did not constitute a search or seizure under the Fourth Amendment.)

10. Invasions of the body for medical purposes are neither a search nor a seizure. *United States v. Chukwubike,* 956 F.2d 209, 212 (9th Cir.1992)(holding that physicians were not government agents and did not conduct a "search" when they acted for medical reasons to save plaintiff's life by removing balloons containing heroin from plaintiff's stomach and rectum and that the lack of plaintiff's consent did not nullify physicians' medical judgment). Also noting that the doctor's use of government-supplied field tests to test for drugs and the fact that the doctor's turned the balloons over to police did not render the doctor's actions a search.

11. The "under color of state law" requirement is equivalent to the state action element of the Fourteenth Amendment. *Briley,* 564 F.2d at 855. Thus, § 1983 is not invoked by "purely private conduct." *Id.* Private action, no matter how wrongful, is not actionable. *Id.*

12. The parties stipulated that Defendants were employees of Maricopa County, and thus, state actors during the relevant time. Although Defendants latter attempted to argue that Defendants Mishra and Mannion were not state actors, the Court finds it unnecessary to reach this issue and, instead, will abide by the parties' stipulation.

13. Dr. Mishra ordered the catheterization for medical purposes only based on information given to her by Plaintiff regarding his inability to urinate and his

back pain. She did not possess the necessary intent to engage in a search or seizure under the Fourth Amendment.

14. Nurse Mannion performed the catheterization based solely upon Dr. Mishra's orders to do so for medical purposes and, therefore, did not possess the necessary intent to engage in a search or seizure under the Fourth Amendment.

■ 15. Plaintiff has failed to establish that Defendant Maricopa County has a policy or procedure that caused or contributed to the alleged violation of Plaintiff's civil rights under the Fourth Amendment. Therefore, the County is not liable. See, *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)(rejecting government liability based on *respondeat superior.*)

■ 16. "A supervisor may be liable if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Redman v. County of San Diego,* 942 F.2d 1435, 1446 (9th Cir.1991) (en banc), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992).

■ 17. Defendant Lt. Rankin, the acting commander during the relevant period, is not liable as a supervisor because the evidence shows that the catheterization was performed solely based on Dr. Mishra's order that Plaintiff be catheterized for medical purposes. The evidence further shows that the catheterization was performed by Nurse Mannion pursuant to Dr. Mishra's medical order that Plaintiff be catheterized in the event he could not urinate voluntarily. Defendant Rankin in no way influenced Dr. Mishra's decision to order the catheterization or Nurse Mannion's execution of the catheterization. Therefore, Plaintiff's claim against Defendant Rankin fails. See, *Rudy v. Village of*

*Sparta,* 990 F.Supp. 924, 929 (W.D.Mich.1996)(holding that where police officer waived inapplicable search warrant, attempted to restrain plaintiff, and instructed technician to "just do it" he was not liable for search because the doctor ordered the catheterization and police officer told the technician to "just do it" only after plaintiff refused to comply with the doctor's orders.); *Lovett v. Boddy,* 810 F.Supp. 844, 848–49 (W.D.Ky.1993)(holding that police officer cannot be held liable for warrantless search where he did not cause the catheterization to take place.)

■ 18. To establish a § 1983 violation against Defendants Leiher, Moyer, and Field, Plaintiff must establish an affirmative link between his alleged injury and the conduct of these Defendants. *Rizzo v. Goode,* 423 U.S. 362, 371–72, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Plaintiff must establish individual fault. *Leer v. Murphy,* 844 F.2d 628, 634 (9th Cir.1988).

19. Because Plaintiff was catheterized solely for medical reasons, it does not constitute either a search or a seizure. *Chukwubike,* 956 F.2d at 212. (citing *United States v. Attson,* 900 F.2d 1427, 1433 (9th Cir.1990)). Therefore, Plaintiff's Fourth Amendment claims against Defendants Leiher, Moyer, and Field fail.

■ 20. Moreover, Plaintiff fails to establish a causal link between the actions of Defendants Leiher, Moyer, Field and his alleged injury. Although the court concluded that Defendant Leiher and "other jail employees" were present during the catheterization, none of these defendants caused the catheterization to occur. Rather, the catheterization occurred because of Dr. Mishra's order. Nurse Mannion executed Dr. Mishra's order to catheterize Plaintiff for medical reasons and the presence and participation of Defendant Leiher and other jail employees in restraining Plaintiff during the procedure does not

nullify the medical judgment which caused the catheterization. See, *Rudy v. Village of Sparta*, 990 F.Supp. 924, 929 (W.D.Mich.1996)(holding that where police officer waived inapplicable search warrant, attempted to restrain plaintiff, and instructed technician to "just do it" he was not liable for search because the doctor ordered the catheterization and police officer told the technician to "just do it" only after plaintiff refused to comply with the doctor's orders.)

21. A competent person has a constitutionally protected liberty interest to refuse unwanted medical treatment. *Cruzan v. Director, Missouri Dept. Of Health*, 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1990). A person's interest in personal autonomy and self-determination is a fundamentally commanding one, with well-established legal and philosophical underpinnings. See, e.g., *Thor v. Superior Court*, 5 Cal.4th 725, 21 Cal.Rptr.2d 357, 362–365, 855 P.2d 375, 380–383 (1993). But this right, like other constitutionally protected interests, is not absolute. As *Cruzan*, 497 U.S. at 279, 110 S.Ct. 2841, explains, whether a person's constitutionally protected liberty interest in refusing unwanted medical treatment has been violated " 'must be determined by balancing his liberty interests against the relevant state interests.' " Also see, *Washington v. Harper*, 494 U.S. 210, 222, 110 S.Ct. 1028, 1037, 108 L.Ed.2d 178 (1990)("The extent of a prisoner's right under the [Due Process] Clause to avoid the unwanted administration of antipsychotic drugs must be defined in the context of the inmate's confinement.").

The Court finds that it is unnecessary to venture into the complicated legal quagmire of whether this prisoner/Plaintiff had the right to withhold his consent to the subject medical procedure under the facts of this case. Assuming *arguendo* that he did have the right to have the catheteriza-

tion stop immediately upon his clear withdrawal of consent and continuation of the catheterization violated the Fourth Amendment, Defendants are entitled to judgment in their favor on the basis of qualified immunity.

22. "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, [the official] should be made to hesitate...." *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). However, where the official acts in an area where "clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' " *Id.* (citation omitted.) Thus, qualified immunity is provided to a public official to protect the official from a civil action for damages, as long as the official's conduct does not violate clearly established federal statutory or constitutional "rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. 2727.

23. To determine whether individual defendants are entitled to qualified immunity, the Court must first identify "the specific right [they] allegedly violated." *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir.1995)(citing *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir.1991)). Then, the Court must determine "whether that right was so 'clearly established' as to alert a reasonable officer to its constitutional parameters." *Id.* If the right is not clearly established, the individual defendants are entitled to qualified immunity. *Thompson v. Souza*, 111 F.3d 694, 698 (9th Cir.1997). If the right is not clearly established, the Court must consider whether a reasonable official could have believed that his or her conduct was lawful. *Mendoza v. Block*, 27 F.3d 1357, 1360 (9th Cir.1994); *Newell v. Sauser*, 79 F.3d 115, 117 (9th Cir.1996).

24. Assuming arguendo that physically holding a prisoner down and forcibly attempting to perform a medical procedure (catheterization) on a prisoner for medical purposes only pursuant to doctor's order after the prisoner clearly withdraws his consent to the medical procedure is an unreasonable search within the meaning of the Fourth Amendment, the Court must determine whether the right at issue was clearly established before January 9, 1998.

25. "To be clearly established, the law must be 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Newell*, 79 F.3d at 117 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "This is not to say that an official's action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. However, "when 'the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Mendoza*, 27 F.3d at 1361 (quoting *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir.1993)); *Backlund v. Barnhart*, 778 F.2d 1386, 1390 (9th Cir.1985)(recognizing that "[t]here may be cases of conduct so egregious" that a constitutional violation would be apparent to any reasonable person). Thus, a constitutional right may be clearly established by common sense as well as closely analogous pre-existing case law. *Newell*, 79 F.3d at 117; *DeBoer v. Pennington*, 206 F.3d 857 (9th Cir.2000).

26. Qualified immunity may shield officials who conduct an unreasonable search or seizure which violates an individual's rights if a reasonable person in the position of the official could have believed that her conduct was lawful. *DeBoer* at 866; *Mendoza* at 1362 ("qualified immunity is available if a reasonable official could have believed the conduct at issue was lawful"); *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir.1996)(qualified immunity is available where, "in light of clearly established principles governing the conduct in question, the official objectively could have believed that his conduct was lawful"). The inquiry is whether in light of the totality of the circumstances the defendants' actions were "objectively reasonable." *DeBoer* 206 F.3d at 866; *Mendoza* 27 F.3d at 1362.

27. Plaintiff has failed to provide, nor has the Court's independent legal research discovered, any case authority that holds an official liable under the Fourth Amendment for forcibly catheterizing a prisoner against his will when the sole purpose of the procedure was medicinal only.

28. It would not have been either apparent or sufficiently clear to a reasonable official on January 9, 1998, that forcibly catheterizing a prisoner or holding down a prisoner so he could be forcibly catheterized, for medical purposes only, would constitute an unreasonable search under the Fourth Amendment.

29. Plaintiff has failed to meet his burden of proof that Defendants, or any of them, have violated clearly established law under the Fourth Amendment.

Accordingly,

**IT IS ORDERED** that **JUDGMENT** is entered for Defendants, and each of them, on Plaintiff's § 1983 claim under the Fourth Amendment.