Jeffrey SULLIVAN, Plaintiff,

v.

Jon BORNEMANN and Ed Whealon, et al., Defendants.

Case No. 00–C–1392

United States District Court, E.D. Wisconsin.

Signed 04/28/2003

Brian C. Hough, Robinson Law Firm, Appleton, WI, for Plaintiff.

Gregg T. Heidenreich, Law Offices of Stilp & Cotton, Brookfield, WI, for Defendants.

## DECISION AND ORDER

William C. Griesbach, United States District Judge

Plaintiff Jeffrey Sullivan commenced this action under 42 U.S.C. § 1983 for damages he sustained as a result of being catheterized against his will at a local medical facility following his arrest for disorderly conduct. The case is presently before me on the motion of the two remaining defendants for summary judgment. For the reasons set forth below, I conclude that the defendants' motion should be granted and therefore order the action dismissed.

## I. Facts

On November 14, 1999, Jeffrey Sullivan was arrested for disorderly conduct in the City of Shawano, Wisconsin.[1] Sullivan was transported to jail by Shawano Police Officer Jon Bornemann, but because Sullivan was evidently intoxicated, the jail would not admit him without medical clearance. Bornemann then took Sullivan to the Shawano Medical Center. Because Sullivan was belligerent and resistive, Bornemann called in another officer to assist. Shawano Police Officer Ed Whealon arrived soon after.

Nurse Kathy Actenberg obtained Sullivan's vitals and noted that he was angry and combative. She also knew that the officers had found a marijuana pipe on him and that he had a breathalyzer test result of .25. Sullivan also had a pulse of 141 and a relatively high, but still within normal range, blood pressure reading. Nurse Actenberg noted Sullivan's status as "nonurgent" and reported her findings to the staff doctor in the emergency room, Dr. Rajeshwar Hanmiah, who told her to obtain a urine sample. Dr. Hanmiah has testified that a urine sample was desirable because Sullivan was acting erratically and excitably and was thus out of line with behavior typical of someone who was simply drunk. Dr. Hanmiah testified that he was concerned that Sullivan might have ingested drugs which were adversely interacting with his system or the high level of alcohol.

Sullivan could not (or would not) provide a urine sample, however. Nurse Actenberg ran water in the room in order to stimulate the production of a sample, but to no avail. She told Dr. Hanmiah that a voluntary sample was not forthcoming, and Dr. Hanmiah then directed her to obtain a sample through a catheter. She warned Sullivan that a catheter would be necessary if he did not voluntarily produce a sample.

Actenberg then explained to the two officers that it was necessary to restrict Sullivan's movement during the procedure in order to avoid injury and infection. Officer Bornemann restrained Sullivan by holding onto his legs and using his body weight to hold Sullivan's legs down. Officer Whealon, who was standing at the head of Sullivan's bed, used a pressure point technique to reduce Sullivan's resistance. This technique involved the placing of the officer's index finger under the bridge of Sullivan's nose to apply pressure and a certain amount of pain. While Sullivan was thus restrained, Nurse Actenberg opened Sullivan's pants and began the catheterization procedure, which consisted of inserting a plastic tube or catheter through his penis and into his bladder. The entire procedure lasted approximately one minute with the

1. The facts are recounted sequentially in the parties' Joint Stipulation of Facts for Pending Motions (Docket # 94).

actual catheterization taking between four and six seconds.

Shortly thereafter, Sullivan was given medical clearance and he was transported to the Shawano County Jail. It is undisputed that Sullivan did not consent to the catheterization and that he suffered pain both from the procedure itself and from the pressure point technique utilized by Whealon.

On the basis of these facts, Sullivan commenced this action against Officers Bornemann and Whealon, Dr. Hanmiah, Nurse Actenberg and Shawano Medical Center. Against each of the defendants, he asserted claims under § 1983 for violations of his rights under the Fourth and Fourteenth Amendments to the United States Constitution and a claim for attorneys fees under 42 U.S.C. § 1988. He also asserted a state law claim for battery against Bornemann and Whealon, and a state law claim for medical malpractice against Dr. Hanmiah and Shawano Medical Center.

Sullivan's § 1983 claims against Dr. Hanmiah, Nurse Actenberg and Shawano Medical Center were dismissed on an earlier motion for summary judgment by Judge J. P. Stadtmueller on the ground that the conduct alleged was not under color of state law. Judge Stadtmueller also granted summary judgment in favor of Dr. Hanmiah and Shawano Medical Center on the claim of medical malpractice because Sullivan failed to present any evidence supporting his claim that either defendant had violated any applicable standard of care. The case was thereafter transferred to me.

Trial on the remaining claims against Officers Bornemann and Whealon was scheduled to commence on January 27, 2003. At a January 16 pretrial conference, the parties agreed that the upcoming trial may not be necessary, at least on the issue of liability, as it appeared that the facts surrounding the forced catheterization were, for the most part, undisputed and the primary disagreement between the parties was over the legal principles that were to be applied to those facts. The disputed legal issues were (1) whether the law enforcement officers had the authority to forcibly restrain Sullivan for the purpose of allowing medical personnel to perform a catheterization against his will under the circumstances of this case; and (2) if the law enforcement officers lacked such authority, would they be entitled to qualified immunity?

Based upon the agreement of the parties, I postponed the trial to allow them to submit briefs and appropriate motions directed to these two issues. Defendants Bornemann and Whealon have now moved for summary judgment on the ground that the undisputed facts show that their conduct in restraining Sullivan was authorized as a matter of state and federal law, and did not violate his rights under the United States Constitution. In the alternative, they argue that even if there are facts in dispute as to whether their conduct was legally authorized, they are entitled to qualified immunity under both federal and state law. Having reviewed the briefs, the case law, and the stipulated facts of the parties, I will address each of those issues in turn. As I do so, I of course note that in order for summary judgment to be granted, it must be shown that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## II. Authority for the Unwanted Catheterization Procedure

 The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." Its overriding function is "to protect personal privacy and dignity against unwarranted intrusion by the State."

*Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Similarly, the common law of the State of Wisconsin, like that of all of the States, protects individuals from intentional and unjustified invasions of their right to personal security by others, whether or not they are acting under the authority of the State, by making such violations actionable in a suit for battery. *Trogun v. Fruchtman,* 58 Wis.2d 569, 596, 207 N.W.2d 297 (1973). Dobbs, *The Law Of Torts,* § 28, at 54, § 47, at 88–90 (West 2000). This right to personal security, protected both by the Constitution and common law, exists even when the unwanted intrusion upon the person of another is part of a medical procedure prescribed for the individual's own benefit. The common law doctrine of informed consent, as well as the due process clause of the Fourteenth Amendment, protect the right of an individual to refuse unwanted medical care. *Cruzan v. Missouri Dept. of Health,* 497 U.S. 261, 277–78, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990); and *Trogun v. Fruchtman,* 58 Wis.2d at 596, 207 N.W.2d 297.

In this case Sullivan claims that the defendant officers violated his right to be free from such unwarranted intrusions upon his person by forcibly restraining him so that a nurse could catheterize him. The mere fact that he was lawfully arrested, Sullivan claims, did not justify the use of brute force to strip and catheterize him against his will. Such conduct, he contends, is actionable under both the common law of Wisconsin and § 1983.[2]

In their motion seeking summary judgment, on the other hand, defendants argue that they had not only the authority but also the duty to assist the nurse by restraining Sullivan. In essence, they argue that the catheterization was prescribed by Dr. Hanmiah for Sullivan's own benefit and that, as a result of his intoxication, he lacked the capacity to refuse it. Because Sullivan was in their custody, defendants contend, they were obligated to insure he received necessary medical care. Thus, their use of force to restrain him so that the catheterization could be performed was not only justified but required.

■ It is of course true that one who provides emergency medical care to a person who is unconscious, incompetent, or otherwise unable to give consent is not liable for battery or other violation of the patient's rights. This "emergency exception" to the requirement of informed consent for medical treatment has been recognized generally in the cases in which the issue has arisen. See, e.g., *Shine v. Vega,* 429 Mass. 456, 464, 709 N.E.2d 58, 63 (1999). See also *Restatement (Second) of Torts,* § 892D (1979); and Meisal, Alan, *The Exceptions To The informed Consent Doctrine: Striking A Balance Between Competing Values in Medical Decision-making,* 1979 Wis. L. Rev. 413, 434–438; and Wis. Stats. § 448.30 (5) and (6). As used in this context, "the term emergency implies both that the patient's health is in jeopardy so that immediate medical attention is required and that a person authorized to consent is not available to make the requisite decision. *The Law Of Torts, supra,* § 106, at 247. See also Wis. Stats. § 880.15 (temporary guardian). Presum-

---

**2.** Sullivan alleges that the defendants' conduct violated his Fourth Amendment right to be free from unreasonable searches and seizures and his right to due process under the Fourteenth Amendment. Although there is some confusion over which Amendment ap-

plies in post-arrest, pre-conviction situations such as this, *see Reed v. City of Chicago,* 77 F.3d 1049, 1051–53 (7th Cir. 1996), I am satisfied that either or both are applicable and he has stated a claim under § 1983.

ably, the exception would apply also to those who assisted the person providing such emergency care.

But it is not clear from the stipulation of facts before me that this was a situation to which such an emergency exception would apply. According to the stipulation. Dr. Hanmiah testified that the reason he directed Nurse Actenberg to obtain Sullivan's urine sample was "because Sullivan's behavior was erratic and out of line with his level of intoxication and elevated heart rate." (Stipulation § 19). Dr. Hanmiah testified that "he was concerned that Sullivan may have co-ingested other drugs, either legal or illegal, that may be interacting within his system . . . ." (*Id*). The stipulation continues, "Based on Sullivan's physical appearance and disposition and from a reading of his vital signs and the medical necessity for his own physical well being, Hanmiah testified that he, as a physician working in an emergency room, believed he could order such a procedure and obtain such a urine sample over Sullivan's objections if he, as a physician, could determine that Sullivan was not competent to make decisions to refuse this type of procedure." (*Id.* ¶ 24).

Unfortunately, the stipulation is silent as to what the possible effects of such an interaction would be, and I am reluctant to assume facts that are not in the record in deciding a motion for summary judgment. Although the stipulation uses the phrase "medical necessity" in a somewhat clumsy and confusing sentence, it fails to provide any explanation as to why such a procedure was medically necessary at that point in time. The stipulation is also silent as to whether alternative and perhaps less objectionable procedures, such as a blood test or a short period of observation, could have been used.

This is not to say that Dr. Hanmiah was not justified in ordering the catheterization without Sullivan's consent. Given the level of alcohol in Sullivan's blood and the behavior he displayed in the emergency room, Dr. Hanmiah could reasonably have concluded that Sullivan lacked the competence to make the decision himself, although I also note that the stipulation does not actually say that he did so conclude. And if a urine sample was required in order to determine whether Sullivan could be safely released from the hospital and admitted to the jail, and there was no other reasonable way to get such a sample, then it would seem Dr. Hanmiah was justified in ordering the catheterization. Indeed, the failure to order such a procedure under such circumstances could very well subject an emergency room physician to liability if needed care and treatment was not provided and the patient/prisoner later suffered adverse health consequences as a result. See, e.g., *Boles v. Milwaukee County*, 150 Wis.2d 801, 443 N.W.2d 679 (Ct. App. 1989).

But the facts needed to determine whether the order was justified are not clear from the record before me. Dr. Hanmiah also testified that he felt "Sullivan was playing games with them, that he was disruptive in the emergency room, and that he was effecting [sic] other patient care." Hanmiah thought it was obvious that Sullivan "was just angry at the officers at the time." (*Id.* § 22). Moreover, Sullivan's status had been designated "non-urgent" when he was admitted, and there is no evidence of any distress after that time. His vital signs, which were only checked upon admission, were within the normal range. And despite Dr. Hanmiah's testimony that he was concerned about the possibility of other drugs interacting with the alcohol Sullivan had ingested, he failed to document any of these concerns in Sullivan's medical record.

This evidence falls short of establishing as a matter of law that Dr. Hanmiah was

faced with the sort of medical emergency that justified ignoring Sullivan's strong objections to the intrusive medical procedure he prescribed. While it may be true that a genuine medical emergency existed, there is nothing in the stipulation to suggest that Dr. Hanmiah thought Sullivan could be in danger of death or serious injury if the procedure was not immediately performed. Although intoxicated, Sullivan was conscious and had even agreed to provide a urine sample voluntarily. The fact that Sullivan may have simply been "playing games" or that he was acting out of anger at the police does not justify ignoring the patient's wishes and subjecting him to such a procedure without his consent.

I am therefore unable to conclude as a matter of law on the record before me that Dr. Hanmiah's catheterization order was justified under the emergency exception to the rule requiring patient consent for medical procedures. And if Dr. Hanmiah did not have authority to order the procedure without Sullivan's consent, the defendants did not have authority to assist the nurse in performing it. But this does not end the inquiry, for the defendants also argue that even if Dr. Hanmiah lacked the authority to order the catheterization absent Sullivan's consent, they acted in good faith in restraining him so the nurse could complete the procedure safely. I therefore turn to that issue.

### III. Qualified Immunity

■ Law enforcement officers performing discretionary functions are generally entitled to qualified immunity and are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Such immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the

law." *Malley v. Briggs* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In evaluating a claim of qualified immunity, courts are instructed to follow a two-step inquiry. First, the court must determine whether the plaintiff has stated a claim for violation of his constitutional rights. If so, the court must then decide whether the right allegedly violated was clearly established at the time such that a reasonable officer would understand that what he was doing violates that right. *Morrell v. Mock*, 270 F.3d 1090, 1094 (7th Cir. 2001).

In this case, I have already held that I am unable to conclude on the facts before me that the forced catheterization was justified under the emergency exception to the rule that consent is required for medical procedures. Thus, at least on the record as it now stands, plaintiff may be able to prove a violation of his constitutional rights. I therefore proceed to the second question: whether the right of the plaintiff to refuse the procedure under the circumstances of this case was clearly established.

■ Plaintiff contends that the right of an individual to refuse unwanted medical care was clearly established at the time in question and, further, that the conduct of the defendants was so patently unreasonable that the absence of a specific case holding it to be so is of no significance. But it is not the general right of a competent person to refuse unwanted medical treatment that is at issue. The Supreme Court has counseled that the right at issue must be addressed within the specific context of the situation, that is, in a more "particularized" rather than general sense. *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Thus, the precise question to ask is: whether an individual in custody, who has exhibited signs of resistance and belligerence, and who displays signs of drunkenness as well as possible

drug use, had a clearly established right to be free from the restraining force employed by the officers, including pain-inducing procedures, when those officers are acting in order to enforce a doctor's order.

■ To be a clearly established right, it must be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.; see also Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003). The contours of the alleged right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right ... [I]n the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523, (1987).

Here, the context of the situation, as stipulated by the parties, shows that Dr. Hanmiah, the attending physician, ordered Nurse Actenberg to obtain a urine sample from the plaintiff. (Joint Stip. ¶ 20.) When this proved to be impossible for Sullivan to produce. Dr. Hanmiah then ordered the catheterization procedure. (Joint Stip. ¶ 24.) The nurse explained to the officers that the procedure would require Sullivan's movement to be restricted in order to minimize the risk of injury and infection to Sullivan, and, although she did not specifically tell them to restrain him, she expected that they would. (Joint Stip. ¶ 25.) The nurse then opened Sullivan's pants and began the procedure while the officers restrained him. (Joint Stip. ¶ 30.)

Under the circumstances of this case, even if Dr. Hanmiah's order was not justified as a matter of law, I do not find that the defendants violated a clearly established right of the plaintiff. To hold otherwise would place any law enforcement officer who accompanies an intoxicated prisoner to the hospital for examination and treatment in the position of having to second-guess the emergency room physician's judgment as to what

treatment is necessary and whether the patient/prisoner is competent to refuse. Compare *Allen v. City of Rockford*, 2002 WL 426117 (N.D. Ill. 2002). I do not understand that to be the law and plaintiff has provided no case law to suggest otherwise.

Indeed, in *Saulsberry v. Maricopa County*, 151 F.Supp.2d 1109, 1119 (D. Ariz. 2001), the court addressed a nearly identical issue, concluding that it would "not have been either apparent or sufficiently clear to a reasonable official ... that forcibly catheterizing a prisoner or holding down a prisoner so he could be forcibly catheterized" would violate the Fourth Amendment. Nor did that court's own research discover any authority to suggest that an officer would be liable under those circumstances. *See id.* Thus, the officials (both the officers and the doctor) were entitled to qualified immunity both for the act of catheterization as well as the act of holding down the plaintiff while the procedure was performed. *Id.* Here, plaintiff has failed to provide any precedent for the contention that the officers should have either abstained from assistance or somehow prevented the catheterization from taking place. Indeed, when a very similar case reaches just the opposite conclusion, it cannot be said that a clearly established constitutional right was violated. See also *Rudy v. Village of Sparta*, 990 F.Supp. 924 (W.D. Mich. 1996), and *Lovett v. Boddy*, 810 F.Supp. 844 (W.D. Ky. 1993).

■ Although plaintiff also alleges that the defendants used excessive force in restraining him and thereby caused him pain, I am satisfied from the undisputed facts that the force used to prevent his movement and gain compliance was not unreasonable and that, in any event, the officers are entitled to qualified immunity on this aspect of the claim as well. The officers were told that Sullivan would have

to be restrained to minimize the risk of injury and infection. Bornemann placed his arms around Sullivan's legs and used his own body weight to keep them stationary. Whealon used a pressure point technique he had been taught in training to induce Sullivan to comply with the nurse's directions. The technique consisted of Whealon placing his index finger under the bridge of Sullivan's nose and applying pressure so as to prevent him from resisting or struggling with the nurse. There is no evidence of any injury other than Sullivan's complaint of pain from the pressure point technique utilized by Whealon.

If, as I have already concluded, the defendants reasonably believed they had the right to restrain Sullivan so that the nurse could perform the catheterization on him, the force used by them in doing so was not excessive under any clearly established standard. *Saucier*, 533 U.S. at 207–09, 121 S.Ct. 2151. The decision to restrain Sullivan was for his own safety. There is not even a suggestion that Bornemann's conduct in physically restraining Sullivan's legs caused any pain or injury. And while the purpose of Whealon's pressure point technique was intended to obtain Sullivan's compliance by inflicting pain, there is no showing that the pain inflicted was beyond what was needed to obtain that compliance for the approximately one minute that it took to complete the procedure. The undisputed facts demonstrate that the force used by the defendants was for the specific purpose of restraining his movement while the procedure was being performed and not, as plaintiff suggests, for malicious or sadistic purposes. There is no evidence to suggest that any force was used beyond what was needed to physically restrain Sullivan. I therefore conclude that the defendants' qualified immunity extends to this aspect of plaintiff's claim as well.

Accordingly, I find that the officers are entitled to qualified immunity on plaintiff's federal claims, whether on excessive force grounds or on due process grounds, as there is no clearly established right to be free from the actions of the officers complained of in this case. Plaintiff's § 1983 claims must therefore be dismissed.

### IV. State Law Claims

■ As noted above, in addition to the constitutional claims, the complaint in this case states claims of battery against both defendants here. I have supplemental jurisdiction over the state claims by virtue of the federal claims asserted under § 1983 pursuant to 28 U.S.C. § 1367. The general rule, however, is that when a federal claim drops out before trial, the federal district court should relinquish jurisdiction over the supplemental claim. *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997). But the rule is not absolute. The court may elect to decide the merits of the state claim where it does not present complex and undecided legal issues and it appears efficient to do so. *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 896 (7th Cir. 2001).

In this case, I conclude that it is appropriate for me to decide the state claims before me. I reach this conclusion in part because the incident giving rise to the action occurred more than three years ago and the case has been pending in this court since October of 2000. The parties have fully briefed the state law issues which are similar to the federal claims that I have already decided. Finally, I conclude that the state claims can be disposed of under well established Wisconsin law. Thus, I conclude that it would be more efficient and economical to the parties for me to dispose of the entire case at this time.

■ Section 893.80(4) of the Wisconsin Statutes provides that no action may be maintained against public agencies or em-

ployees for acts done in the exercise of "legislative, quasi-legislative, judicial, or quasi-judicial functions." The terms quasi-legislative" and "quasi-judicial" have been held by the Wisconsin courts to be synonymous with "discretionary." *Scarpaci v. Milwaukee County*, 96 Wis.2d 663, 683, 292 N.W.2d 816 (1980). Discretionary acts, in turn, are contrasted with ministerial acts. Whereas discretionary acts are acts involving the exercise of judgment, ministerial acts are those in which the "duty is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *C.L. v. Olson*, 143 Wis.2d 701, 711–12, 422 N.W.2d 614 (1988). Under Wis. Stats. § 893.80(4), public officers are immune from liability for discretionary acts that require the exercise of judgment in carrying out their governmental duties. *Gordon v. Milwaukee County*, 125 Wis.2d 62, 67, 370 N.W.2d 803 (Ct. App. 1985).

In *Sherry v. Salvo*, 205 Wis.2d 14, 555 N.W.2d 402 (Ct. App. 1996), and *Sheridan v. City of Janesville*, 164 Wis.2d 420, 474 N.W.2d 799 (Ct. App. 1991), the Wisconsin Court of Appeals held that law enforcement officers were immune from liability under § 893.80(4) for injuries that allegedly resulted from their decisions to restrain the plaintiffs. In *Sheridan*, a motorist brought suit against the city and two police officers for injuries he sustained while the police officers were performing sobriety tests and effecting his arrest. In affirming the trial court's summary judgment in favor of the defendants, the court stated:

> We do not believe the police officers' conduct in executing Sheridan's arrest can fairly be characterized as "non-governmental." Their decisions regarding the manner in which the arrest was effectuated involved numerous applica-

tions of governing statutes and case law. They were required to determine whether Sheridan should be searched, handcuffed, subjected to force during execution of the arrest, and given a breathalyzer. These decisions involved "subjective evaluation of the law ...."

164 Wis.2d at 427–28, 474 N.W.2d 799 (citations omitted).

In *Sherry*, the facts are even more similar to those before me in this case. The plaintiff went to the hospital emergency room complaining of breathing difficulties and shortness of breath. He advised the staff that he had taken an overdose of a muscle relaxant, but it quickly became apparent that he had taken other substances as well. When the doctor prescribed intravenous medication and ordered a blood sample to determine the type and quantity of other substances he had ingested, the plaintiff became combative and refused. Police were called and two officers eventually arrived and restrained the plaintiff so that blood samples could be taken. In the course of his struggle with the officers, the plaintiff sustained a fracture to his wrist and later sued. In affirming the trial court's dismissal of the plaintiff's suit, the Court of Appeals noted:

> Like the officers in *Sheridan*, the Tomah officers' acts in restraining Sherry were highly discretionary. They were reacting to highly charged and dynamic circumstances in pursuing and subduing Sherry, and were using their professional judgment as to how that task might best be accomplished. We see no error in the trial court's ruling that the officers are immune from liability under § 893.80, Stats.

205 Wis.2d at 23, 555 N.W.2d 402.

On the basis of these decisions, I conclude that the defendant law enforcement officers in this case are immune from liability on Sullivan's state law claims

against them under § 893.80. The decision to assist the medical staff by restraining Sullivan so that the catheterization could be safely performed, like the decisions of the officers in *Sheridan* and *Sherry*, was a discretionary one. It involved the application of uncertain principles of law to a dynamic set of circumstances the result of which could have meant a life or death difference to the person they held in custody. This is precisely the kind of discretionary decision for which § 893.80 was intended to provide law enforcement officers protection from liability. I therefore conclude that Sullivan's state law battery claim should also be dismissed.

Accordingly, **IT IS ORDERED** that the defendants' motion for summary judgment is **GRANTED** and plaintiff's federal and state claims are **DISMISSED** with prejudice.

Dated this 28th day of April, 2003.